The Law Office of
John Richard Bordallo Bell
341 S. Marine Corps Drive
RK Plaza Suite 309
Tamuning, Guam 96913
Tel: (671) 646-5722 (JRBB)
john.r.b.bell@gmail.com
*Attorney for Plaintiff Jarret Hogue
And Gelyne Gambito*


FILED
DISTRICT COURT OF GUAM
MAY 09 2016
JEANNE G. QUINATA
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

JARRET HOGUE and
GELYNE GAMBITO

　　　　Plaintiffs,

　　　　vs.

PACIFIC COMPOSITES, INC., dba SHIPRIGHT! and BOATSHOP, AMANDA YOUNG, CHRISTOPHEAR YOUNG, MOYLAN'S INSURANCE UNDERWRITERS, INC., and, in her personal capacity, JOANNALYNN FULLERTON,

　　　　Defendants.

CIVIL CASE NO. CV 16-00041

**COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL**

## I.　PARTIES

1. Plaintiff Jarret Hogue ("Hogue") is and at all relevant times has been a U.S. citizen and a resident of California and Guam, currently residing in California.

2. Plaintiff Gelyne Gambito ("Gambito") is and at all relevant times has been a U.S. citizen and a resident of California and Guam, currently residing in California.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 1

3. Plaintiffs are currently unmarried but have been dating and living together in a committed relationship since 2009 and at all legally relevant times described herein.

4. Upon information and belief, Defendant Pacific Composites, Inc., dba *ShipRight!* and *boatSHOP* ("PCI") is a maritime repair and supply shop incorporated under the laws of Guam with its principal place of business at Hagatna, Guam.

5. Defendant Amanda Young is and has been at all relevant times a resident of Guam and both the President and an employee of PCI.

6. Defendant Christophear "Chris" Young ("Chris Young") is and has been at all relevant times a resident of Guam, as well as Secretary, Treasurer, Chief Operating Officer, and an employee of PCI.

7. Upon information and belief, Defendant Moylan's Insurance Underwriters, Inc. ("Moylan's"), is a business incorporated under Guam law with its principal place of business in Hagatna, Guam.

8. Defendant JoAnnalyn Fullerton ("Fullerton") is and has been at all relevant times a resident of Guam, and, while sued strictly in her personal capacity, is Guam's Workers Compensation Commission ("WCC") Administrator.

## II. JURISDICTION

9. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (Federal Question). This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, for employment discrimination and retaliation. Jurisdiction is further conferred on this Court by 42 U.S.C. Section 2000e(5). Equitable and other relief are also sought under 42 U.S.C. 2000e(5)(g). Jurisdiction is also based on 28 U.S.C. Sections 1343 and 42 U.S.C.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 2

Sections 1981, *et seq*, and this Court may exercise supplemental jurisdiction of all related territorial based claims.

### III. DEMAND FOR JURY TRIAL

10. Plaintiffs hereby request a jury trial on all issues raised in this complaint.

### IV. STATEMENT OF FACTS AND CLAIMS

11. In December of 2013, Hogue, while still living in California, began telephone and email discussions with Chris Young regarding potential employment with PCI. By May of 2014, Chris Young and Amanda Young offered Hogue a car to use "indefinitely" while employed, as well as a derelict sailboat to live on.

12. In late July and mid-August of 2014, via several emails, Chris Young and Hogue further negotiated employment terms such as work days, hours, overtime, contracts, housing, job security, probation, growth opportunities, and defraying the extraordinary expense of relocating to Guam.

13. On November 20, 2014, Hogue emailed Chris Young requesting hourly employee details, including the taxes and withholdings, overtime, guaranteed hours, local housing costs, and the logistics of getting around. Chris Young assured Hogue he would get a regular paycheck with occasional overtime and would not have a hard time getting around the island.

14. As Plaintiffs would later discover, PCI has a practice of designating employees as 'independent contractors' in an unlawful attempt to evade tax and other employment responsibilities. PCI in fact had at least the following 15 employees during the approximate period described herein, including but not limited to: Amanda Young, Chris Young, Bryan Heflin ("Heflin"), Gambito, Hogue, Twyla Young, Nicolas Bechey, Keith

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 3

Gutierrez, Kyle Toves, Andrea Grajek, Trevor Bustos, Kirsten Lewis, Al Sizemore ("Sizemore"), Robin Young, and Keith Quintanilla ("Quintanilla").

15. In late March of 2015, after negotiations continued for months, Hogue agreed to relocate to Guam, agreeing to pay back half of approximately $1,600.00 in travel costs, with $12.50 hourly, and indefinite use of the Youngs' 2001 Honda CRV ("the CRV").

16. On April 12, 2015, Hogue arrived on Guam and started work the next day. With no employee handbook issued, no labor-related postings to be found, and no training or orientation provided, Hogue was immediately put to work.

17. About a week after starting the job, when the CRV PCI provided to Hogue began breaking down, Chris Young suggested to Hogue that Hogue move to Agat so that it would be convenient for Chris Young to give Hogue rides to and from work every day. Chris Young did not mention that Chris Young often came in late or not at all. Hogue accordingly moved to Agat.

18. Quintanilla, the shop manager, unlawfully designated as an independent contractor by PCI, immediately shunned and remained aloof toward Hogue. Not far into Hogue's employment, Quintanilla told Hogue that Quintanilla would have rather Hogue's job gone to someone local.

19. Hogue immediately relayed to Chris Young that he had felt discriminated against for not being "local," but Chris Young responded by telling Hogue to get used to it and took no other action. Notwithstanding Chris Young's indifference, Hogue repeatedly asked Chris Young to talk to the employees at the shop regarding the discrimination.

20. Beginning on or about April 14th and 15th, 2015, Chris Young required Hogue and other employees to close all the warehouse doors during painting and grinding work so

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 4

the Guam legislature would not notice the grinding dust coming out of the shop and coating their cars, explaining, "I could get shut down for that."

21. During this same time period, for approximately 10 days straight, with no day off, Hogue worked 13 to 18 hour days with no more than an hour break. At all relevant times, PCI's policy was to deduct wages from all employees for a meal break whether the employee was actually able to take the break or not.

22. Despite specifically negotiating to be hired as a regular hourly employee, for the first 2 weekly pay periods, Hogue was paid via a business check without any breakdown for taxes or other deductions. With all the overtime he had worked, Hogue should have been paid approximately $2,650.00. Instead, Hogue was paid no overtime and was denied approximately $1,275.00 worth of earned wages.

23. During this same time period, the CRV provided by PCI became unsafe to operate. The transmission would slip and the #3 cylinder was not firing, making merging in traffic and uphill driving dangerous. Chris Young did little to assist with the car problems. Between transportation problems and Chris Young's refusal to give Hogue a ride into work, which was the reason provided by Chris Young in suggesting Hogue move to Agat, Hogue was sometimes unable to report timely to work.

24. Still, Hogue's attendance was better than most of PCI's employees, and often times Hogue would show up only to have to wait around for others to arrive. Hogue was later given a key to the shop and from then on he was usually the first one in. On May 7, 2015, Hogue negotiated for and received a raise from $12.50 hourly to $15.00 hourly.

25. In early May, 2015, a heated exchange occurred between Hogue and Quintanilla regarding the handling of tools and supplies provided by PCI. Hogue was deeply

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 5

concerned about Quintanilla's unreasonable aggression and told Chris Young and Amanda Young, "for all I know, I will get a hammer to the back of my head, or jumped and stabbed outside of work."

26. In late May or early June of 2015, Chris Young bragged to Hogue and Gambito that the shop was condemnable but that Chris Young's connections with the Guam Fire Department ("GFD") would protect PCI and that Chris Young intended to enrich himself by secretly switching up boat engines purchased by GFD and the Port Police. Chris Young would later brag to Gambito that he would surreptitiously pass required facility inspections by fooling the inspectors into inspecting a sham jobsite that was not PCI's.

27. On or about June 15, 2016, having arrived on Guam about a week after Hogue, Gambito began working at PCI for $10.00 hourly as a sales associate. However, PCI paid Gambito unlawfully 'off the books' such that Gambito was denied approximately $500.00 in earned wages during Gambito's first month of employment.

28. During this period, at Friday meetings, Hogue and Gambito brought up several concerns about the safety of PCI's worksite, but with little to no progress. Chris Young did, however, inform Hogue that PCI intended to promote both Hogue and Quintanilla to "Project Supervisors," although Quintanilla's discriminatory animus toward Hogue caused the plan to fall through.

29. From early to mid July of 2015, due to PCI's workload, in addition to Gambito's scheduled and paid hours, Gambito worked approximately 3 to 4 hours a day, without a lunch break, for which Gambito was not compensated, all of which both Chris Young and Amanda Young knowingly permitted, wherein Gambito earned hundreds more in unpaid wages.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 6

30. Subsequently, PCI began to pay Gambito 'on the books' as an hourly employee. However, Amanda Young then provided Gambito with a job description which ostensibly gave Gambito management duties and a title of 'Assistant Administrator,' but without any pay increase or fixed salary. When Gambito objected, Amanda Young promised to revise the job description but never in fact did so.

31. During this same period, Amanda Young began to admit to Gambito that Amanda Young should have hired a local and regretted hiring Hogue, a "statesider," because of his "stateside, money grubbing vibe." Amanda Young further acknowledged Hogue would not succeed at PCI because Hogue had "created waves." Gambito voiced her disagreement with Amanda Young by stating that if Hogue did not succeed at PCI it would be because PCI did not give Hogue the proper managerial support and coaching every employee needs to succeed.

32. Notwithstanding the warning not to make waves, both Plaintiffs continued complaining to Chris Young about employees showing up late and disappearing to smoke marijuana during shifts. Chris Young personally would buy beer for the crew to drink while they worked, and, despite the Plaintiffs' concerns, Chris Young would smoke in the shop near flammable materials.

33. Toward the end of July of 2015, Gambito complained to Chris Young about the dust and dirt building up in the merchandise store connected to the workshop, which Chris Young admitted emanated from the shop and entered the store through his office.

34. During an incident near this same period, as reported to Chris Young, Quintanilla started yelling, screaming, and cursing at Hogue nose to nose and chest to chest simply

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 7

because Quintanilla had overheard Hogue asking Robin Young to pick up trash Robin Young had thrown on the ground.

35.   Another PCI employee unlawfully misclassified as an 'independent contractor,' Sizemore, would sexually harass Gambito throughout Gambito's employment at PCI. In late July of 2015 Sizemore told her, "I had a wet dream about you...you where bent over my pool table...[further graphic details omitted]."

36.   In early August of 2015, Heflin threatened Hogue, screaming, "I'll fucking kill you!" after Hogue had accidentally hit Heflin in the back with a screen cover, a very light material used on boats. From that point on, Heflin was especially hostile and unprofessional toward Plaintiffs.

37.   In late August of 2015, Gambito told Chris Young that toxic dust and fumes from the workshop were increasingly getting into the merchandise store where Gambito worked. On several occasions, the dust and fumes caused Gambito to have to leave early. On other occasions, Chris Young insisted Gambito remain at work despite the dust and fumes which induced in Gambito migraines and vomiting. PCI refused to document any of these incidents.

38.   In the first week of September 2015, Sizemore commented to Gambito that he "put nipples on the store front mannequin," that Gambito was "so fucking hot," that he was "distracted by [her] shorts," and that her breasts were large (while staring at her breasts).

39.   In the last week of September of 2015, Sizemore further added "If I were your boyfriend I would beat up [Heflin for you]." Because Chris Young had previously told Gambito that Sizemore was a key player in the maritime industry and Chris Young could

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 8

not afford to lose Sizemore, Gambito did not immediately report Sizemore and tried her best to nervously laugh it off and diffuse the situation.

40. On September 16, 2015, PCI increased Gambito's hourly wage to $16.00. Approximately one week later, on the evening of September 23, 2015, Chris Young admitted to Plaintiffs and Robin Young that Chris Young had a plan to break his lease by getting building inspectors to condemn PCI's current building.

41. On September 28, 2015, Hogue notified Chris Young over the telephone about Sizemore's harassment of Gambito, but Chris Young responded only with an awkward silence. The next day, Gambito gave Amanda Young Gambito's 2 week notice while they were both outside the Plaintiffs' home in Agat.

42. On September 30, 2015, PCI cut Hogue a paycheck covering September 16th to September 25th 2015 for 81.25 hours of work over this 9 day period *without* overtime pay.

43. The next day, Hogue was fired by PCI in a letter from Chris Young, ostensibly due to PCI's "rebranding, reorganization, and restructuring phase, which regrettably has lead to making some very hard and necessary decisions." Gambito received a similar letter this day wherein PCI claimed to have fired Gambito due to the "unprofessional manner" of Gambito's giving her 2 weeks' notice.

44. On October 27, 2015, Plaintiffs both filed whistle-blower complaints with the federal Occupational Safety and Health Administration ("OSHA"). On the same day, Gambito filed and served on PCI a statutory notice of her work injury.

45. Under Guam law and according to its public representations, the WCC's mission, in part is, "to ensure prompt and accurate benefit payments and appropriate timely service to injured employees in order to facilitate their return to gainful employment."

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 9

46. On October 29, 2015, Amanda Young met with Fullerton, who advised Amanda Young to process the claim via her insurance adjuster, Gina Valentine, at Moylan's Insurance. However, Amanda Young, Fullerton, and Moylan's Insurance have since conspired to simply sweep the claim under the rug.

47. As indicated by several Freedom of Information Act responses over the past several months, this has been the custom and practice on Guam for at least the last 5 years with regard to the way employers, insurance adjusters, and Fullerton conspire to 'dispose' of workers compensation claims.

48. For at least the past 5 years, the common experience for employees suffering work injuries has been that Fullerton will scream at them and/or refuse to process the claim in good faith despite her legal obligation to do so.

49. Fullerton has gone so far as specifically ignoring a direct order from current Guam Department of Labor Director, Maria Connelley, to process workers compensation claims even where the employer refuses to comply with its statutory requirements to report the claim or injury.

50. Moreover, even if the injured worker's claim were to proceed to an insurance adjuster, under the currently dysfunctional WCC system, the adjuster can simply deny the claim in bad faith and do so with impunity because Guam's adjusters generally know that Fullerton will sweep the claim under the rug to the insurance company's financial benefit.

51. Because the WCC currently refuses to enforce statutory requirements and administrative rules, including ignoring virtually every meaningful law on the books with regard to recorded public hearings, Fullerton is able to personally decide who gets compensation and who does not, regardless of any statutory requirements to the contrary.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 10

52. Thus, Guam's laborers truly have no meaningful workers compensation rights. Specifically Gambito enjoys no meaningful administrative recourse because Fullerton intentionally refuses to process Gambito's claim within the workers compensation system despite having actual knowledge of the claim and despite having actual knowledge that Moylan's was refusing, in bad faith, to process Gambito's claim.

53. On November 15, 2015, likely as a result of Plaintiffs' complaints, an OSHA inspection was conducted at the PCI worksite.

54. In December 2015 and January 2016, Valentine represented that Moylan's had no intention of processing Gambito's claim, according to Valentine, because Amanda Young refused to cooperate with the claims notification process. Thus, Gambito sought her own evaluation and treatment in California. According to Doctors Mohammed Ali and Michael Rudolph, an MRI, bloodwork, x-ray, and other tests revealed, "a cyst on [Gambito's] pineal gland… [despite no]…head injury during her lifetime."

55. Gambito's medical reports further revealed that epoxy and other chemicals used at PCI may have caused nervous system damage and Gambito's headaches and that, pending ongoing medical confirmation, in light of no history of head trauma, there would likely be no apportionment of the claim [meaning all of the symptoms and injury were work-related].

56. On January 11, 2016, Plaintiffs each filed race, sex, and national origin discrimination and retaliation complaints with the Equal Employment Opportunity Commission ("EEOC"), receiving their 'Right to Sue' letters on February 12, 2016.

57. At least as early as February 22, 2016, Plaintiffs began inquiring with PCI, via respective counsels, on the status of their W-2 tax forms, ahead of tax season. PCI never

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 11

responded to Plaintiffs regarding their W-2 forms until March 31, 2016, wherein PCI sent Hogue a 1099 tax form falsely alleging Hogue had earned $1,769.94 in 'miscellaneous' income. Otherwise, neither Plaintiff received any of their employment-related tax documents required by law, causing Plaintiffs additional frustration and hardship.

58. On March 21, 2016, despite Moylan's actual knowledge of Gambito's work injury, Valentine reiterated in writing that Moylan's was in fact refusing to process Gambito's claim and that Moylan's reason for doing so was Amanda Young's refusal to comply with her statutory obligations on behalf of PCI to report the injury to Moylan's insurance.

### Count I: Hogue's Wrongful Discharge in Violation of Public Policy

59. Plaintiffs re-allege and incorporate paragraphs 1 through 58 above.

60. Several clear public policies support protecting workers from wrongful terminations for reporting unsafe, violent, and discriminatory workplaces.

61. If PCI were lawfully permitted to terminate its employees in retaliation for reporting unsafe, violent, and discriminatory workplaces, employees would be dissuaded from enforcing labor laws by reporting such problems to management.

62. Here, the timing of Hogue's dismissal demonstrates a retaliatory firing because Hogue was fired just 5 months into a job wherein Hogue had been complaining about unsafe, violent, and discriminatory working conditions on behalf of both himself and his girlfriend and co-worker Gambito. Specifically, Hogue was fired just two days after reporting to Chris Young that Sizemore had been sexually harassing Gambito.

63. PCI's facially neutral but conveniently vague termination letter indicates Chris Young and Amanda Young each knew they had no good cause or legitimate business reason to fire Hogue and had to think up a pre-textual basis for appearances' sake.

64. That PCI's written basis for Hogue's termination was pre-textual is especially apparent light of the fact the PCI would later change its reasons for termination, telling the EEOC Hogue was fired for *cause*; ostensibly for poor attendance and performance, despite the fact that Hogue was more reliable than most employees and earned a raise from $12.50 per hour to $15.00 per hour just 3 weeks into starting the job.

**Count II: Gambito's Wrongful Constructive Discharge in Violation of Public Policy**

65. Plaintiffs re-allege and incorporate paragraphs 1 through 64 above.

66. Several clear public policies support protecting workers from wrongful terminations for reporting unsafe, violent, and discriminatory workplaces.

67. If PCI were lawfully permitted to terminate its employees in retaliation for reporting unsafe, violent, and discriminatory workplaces, employees would be dissuaded from enforcing labor laws by reporting such problems to management.

68. Here, the timing of both Gambito's resignation and early termination suggests a retaliatory firing because Gambito was fired just over 3 months into a job wherein Gambito had been complaining about unsafe, violent, and discriminatory working conditions on behalf of both herself and her boyfriend and co-worker Hogue.

69. Specifically, Gambito was forced to resign just one day after Hogue had reported to Chris Young that Sizemore had been sexually harassing Gambito, wherein Chris Young's response indicated Chris Young would do nothing.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 13

70. PCI's vague early-termination letter accusing Gambito of resigning in an "unprofessional manner" letter is indicative of PCI's vindictive attitude toward Gambito as a result of Gambito complaining about the labor violations described herein.

71. As to the constructive discharge, Gambito's resignation was the only reasonable course of action wherein Gambito was being constantly sexually harassed, wherein Gambito was forced to breathe in toxic fumes which were making her seriously ill, wherein Gambito was being denied earned wages, and where Gambito was forced to endure racially discriminatory remarks and behavior against her boyfriend Hogue.

**Count III: Race and National Origin Discrimination and Retaliation Against Hogue and Retaliation Against Gambito Under Title VII and 42 USC § 1981 by PCI and by the Chris Young and Amanda Young in Their Individual Capacities**

72. Plaintiffs re-allege and incorporate paragraphs 1 through 71 above.

73. Hogue, being of Californian origin and Caucasian descent, was treated by PCI employees the way many 'haoles' on Guam are treated; with disdain and mistrust as someone assumed to think and act as if they are 'superior', based merely on the fact they are 'haole,' i.e., a Caucasion person from the geographic mainland United States.

74. Between Amanda Young's admissions to Gambito that Amanda Young thought of Hogue as a typical 'money grubbing state-sider,' the often intense and violent treatment by Quintanilla and Heflin, and the fact that neither of the Chris Young nor Amanda Young were willing to take the necessary steps to protect Hogue from such harassment, Hogue faced a hostile and offensive work environment which resulted in an unlawful termination; a retaliatory act based on discriminatory animus and Hogue's engaging in protected efforts to end the discrimination.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 14

75. While the elements of liability for race/national origin discrimination and retaliation under Title VII and 42 USC § 1981 are very similar, under only the latter provision, both Amanda Young and Chris Young are *personally* liable for Hogue's mistreatment due to being an oft-ostracized racial minority on Guam. Aside from Amanda Young's admission to Gambito that Amanda Young held her own racial animus against Hogue, Chris Young, by telling Hogue to 'get used to' being treated as a perpetual outsider and refusing to eliminate the harassment, effectively *encouraged* his employees to harass Hogue for being a 'haole.'

76. Under both Title VII and 42 USC § 1981, a materially adverse employment action that deters a reasonable employee from reporting racial discrimination against other employees is also unlawful. Here, when Amanda Young made derogatory racial remarks against Hogue to Gambito, Gambito stood up for Hogue and challenged Amanda Young's unlawful actions of basing Amanda Young's evaluation of Hogue on a racial stereotype against 'haoles.'

77. In response, PCI forced Gambito to work in a room full of toxic fumes, did nothing to help Gambito when she reported Sizemore's sexual harassment, caused Gambito to quit in frustration and disgust, fired Gambito ahead of her proposed final day, deprived Gambito of her W-2 form, and Amanda Young personally saw to it that Gambito did not get workers compensation coverage for Gambito's illness by intentionally withholding the statutory work injury notice from Moylan's insurance.

**Count IV: Title VII Discrimination and Retaliation Against Gambito On the Basis of Gender and Gambito's Engaging in Protected Activity**

78. Plaintiffs re-allege and incorporate paragraphs 1 through 77 above.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 15

79. As provided above, Gambito suffered intentional, unwanted discrimination because she is a woman, in that, on several occasions, Sizemore made several inappropriate and sexually charged comments directed at Gambito, including comments in July of 2015 regarding 'bending her over' and several particularly graphic comments throughout September of 2015.

80. Such overtly sexual and inappropriate comments in the workplace made Gambito reasonably feel powerful emotions of humiliation, fear, and disgust, such that enduring the harassment became an unreasonable term and condition of employment.

81. Moreover, despite the fact PCI had no policies or procedures designed to prevent or report sexual harassment, Gambito did report the harassment, but to no avail.

**Count V: Wage and Hour Violations of Hogue's Rights Under Guam Law**

82. Plaintiffs re-allege and incorporate paragraphs 1 through 81 above.

83. Per 22 GCA §§ 3107(a), 3201(a), 3218, and 3219(a), *et seq.*, all wages earned by regular hourly employees, including time and a half for all hours worked over 40 hours in a 7 day work week, must be timely paid within 7 days, as well as immediately upon discharge, lest the employer be liable for back-pay, treble damages, and attorneys fees.

84. Here, as provided above, Hogue, as a regular hourly employee, earned wages in April and September of 2015, as well as additional periods to be proven a trial, for which Hogue was not timely paid and in fact still has never been paid.

85. The record above, including but not limited to the fact Hogue was paid 'under the table,' received a 1099 tax form, and still has never received his W-2 tax form, suggests that PCI's refusal to timely pay Hogue's earned wages was both willful and wanton.

86. Thus, Hogue is entitled to back-pay for all unpaid wages with treble damages as well as attorney's fees and other legal costs.

**Count VI: Wage and Hour Violations of Gambito's Rights Under Guam Law**

87. Plaintiffs re-allege and incorporate paragraphs 1 through 86 above.

88. Per 22 GCA §§ 3107(a), 3201(a), 3218, and 3219(a), *et seq.*, all wages earned by regular hourly employees, including time and a half for all hours worked of 40 hours in a 7 day work week, must be timely paid within 7 days, as well as immediately upon discharge, lest the employer be liable for back-pay, treble damages, and attorney's fees.

89. Here, as provided above, Gambito, as a regular hourly employee, earned wages in June and July of 2015, as well as additional periods to be proven a trial, for which she was not timely paid and in fact still has never been paid.

90. The record above, including but not limited to the facts Gambito was paid 'under the table,' that PCI had tried to misclassify Gambito as management so as to avoid paying overtime, and that Gambito still has never received her W-2 tax form, suggests that PCI's refusal to timely pay Gambito's earned wages was both willful and wanton.

91. Thus, Gambito is entitled to back-pay for all unpaid wages with treble damages as well as attorney's fees and other legal costs.

**Count VII: Gambito's Claim for Insurance Bad Faith Against Moylan's Insurance**

92. Plaintiffs re-allege and incorporate paragraphs 1 through 91 above.

93. Guam law requires all businesses to purchase workers compensation insurance, with the intended beneficiaries being the businesses' employees, to whom the insurance carrier owes a duty of good faith and fair dealing.

94. 22 GCA § 9137 provides, "In order that the liability for compensation imposed by this Title may be most effectively discharged by the employer, and in order that the administration of this Title in respect of such liability may be facilitated, the Commission shall by regulation provide for the discharge, by the carrier for such employer, of such obligations and duties of the employer…in order to effectuate the provisions of this Law. For such purposes…<u>notice to or knowledge of the employer of the occurrence of the injury shall be notice to or knowledge of the carrier.</u>" [emphasis added].

95. As provided above, despite actual knowledge of Gambito's work injury claim, Moylan's has refused to process Gambito's claim ostensibly on the basis that Amanda Young refused to cooperate in providing Moylan's insurance with such notice in writing.

96. Thus, Moylan's has unreasonably withheld benefits due under PCI's workers compensation policy with actual and/or constructive actual knowledge that such a refusal was both unreasonable and without proper basis in fact or law.

97. As further indicated above, Gambito has exhausted her administrative remedies to the point of futility by submitting notice of her claim to PCI, WCC, and Moylan's, to no avail, as each party colluded to deny Gambito's claim and leave Gambito with no meaningful recourse, in part, because even if Gambito's claim were correctly processed through WCC's dysfunctional system, Fullerton has demonstrated a clear bias against claimants in general including Gambito in particular.

**Count VIII: Gambito's Claim for Intentional Infliction of Emotional Distress Against Fullerton in Her Personal Capacity**

98. Plaintiffs re-allege and incorporate paragraphs 1 through 97 above.

99. According to Guam law and WCC's official policy statements, its mission, at least in part, is, "to ensure prompt and accurate benefit payments and appropriate timely service to injured employees in order to facilitate their return to gainful employment."

100. Yet, as presented herein, Fullerton has intentionally refused to process Gambito's claim and has colluded with Moylan's and PCI to ensure Gambito is without recourse, leaving further exhaustion of Gambito's administrative remedies futile.

101. Such a willful disregard for Gambito's due process rights is directly contrary to the scope and course of Fullerton's employment and consistent with Fullerton's systematically willful disregard for her duties, so much so that Fullerton is more likely than not criminally liable under 9 GCA § 49.90, relating to Official Misconduct.

102. Fullerton's intentional and egregious harm to Gambito's health and well-being is extreme, outrageous, and exceeds all bounds of decency.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

a. For all damages incurred;

b. For attorney's fees and costs of suit;

c. For treble damages as permitted by law;

d. For pre-judgment and post-judgment interest as allowed by law;

e. For such other relief as the Court may deem proper.

Respectfully submitted at Hagatna, Guam on this 9th day of May, 2016.

_____
John Richard Bordallo Bell, Esq.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 19

# VERIFICATION

The undersigned, being first duly sworn, deposes and says that he/she is a party to the above-entitled matter; the foregoing document is true of his/her own knowledge, except as to matters which are therein stated on her information or belief and as to those matters he/she believes them to be true.

_____
JARRET HOGUE, Plaintiff

_____
GELYNE GAMBITO, Plaintiff

SUBSCRIBED AND SWORN to before me this 2 day of May, 2016

) ss.
)
)

_____ NOTARY PUBLIC

MASSEE OMAR RASULI
Commission # 1996020
Notary Public - California
Orange County
My Comm. Expires Nov 25, 2016

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

COMPLAINT FOR MONEY DAMAGES; DEMAND FOR JURY TRIAL - 20